UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:21-cr-684 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| JOSHUA FORTSON, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Now before the Court is the motion of defendant Joshua Fortson ("Fortson") to suppress all evidence derived from a March 6, 2019 search of an Akron, Ohio apartment where Fortson was residing. (Doc. No. 21; *see* Doc. No. 22 (Memorandum in Support).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 24 (Response); Doc. No. 25 (Supplemental Response).) On October 12, 2022, the Court conducted an evidentiary hearing on the motion.[1] At the conclusion of the hearing, the Court took the motion under advisement. For the reasons that follow, Fortson's motion is DENIED.

**I. BACKGROUND**

There is no dispute that on the date of the challenged search, Fortson was serving a term of supervised release in connection with his state law convictions for sexual battery and drug

---

[1] The motion hearing was continued on multiple occasions, at Fortson's request, due to the unavailability of a defense witness. (*See* Doc. No. 26 (Motion to Continue Suppression Hearing); Non-doc. Order, dated 5/20/2022, granting motion; Doc. No. 27 (Joint Motion to Continue Suppression Hearing); Non-doc. Order, dated 6/02/2022, granting joint motion; Doc. No. 28 (Motion to Continue Suppression Hearing); Non-doc. Order, dated 6/30/2022, grating motion; Doc. No. 29 (Motion to Continue Final Pretrial Conference); Non-doc. Order, dated 9/08/2022, granting motion and directing the parties to confer on a new date for the suppression hearing.)

trafficking. As part of his supervision, Fortson signed and agreed to certain conditions set forth and enforced by the Ohio Adult Parole Authority ("APA"). (Doc. No. 24-2 (Conditions of Supervision); *see* Gov. Hearing Ex. 2 (same).)

According to these conditions, Fortson agreed to abide by all orders of his supervising officer or any authorized APA representative. (Doc. No. 24-2, at 2.[2]) Relevant to the present motion, he specifically agreed to submit to drug testing and to seek permission from his supervising officer before changing his residence. (*Id.*) On the date of the search, Fortson's APA-approved address was located at 531 Ravenna Avenue, Ravenna, Ohio 44266. (*See* Doc. No. 22, at 1.) Additionally, as part of his supervision, Fortson agreed to refrain from owning or possessing any firearms, and agreed to abide by all laws, including those prohibiting illegal drug possession or use. (Doc. No. 24-2, at 2.) He also signed a notice indicating that he understood that, pursuant to Ohio Rev. Code §§ 2951.02 and 2967.131, he was subject to warrantless searches. (*Id.*)

At the time of the search, Fortson's supervising officer was Chad Rankin. P.O. Rankin testified at the hearing that on March 4, 2022, Fortson tested positive for marijuana, and, as a result of this supervision violation, Fortson was fitted with a GPS ankle monitor as a sanction. While Fortson was originally instructed to report back to APA on March 6, 2022, an alert was received from Fortson's ankle monitor suggesting a problem with the unit, and he was directed to report instead on March 5, 2022. In addition to the alert, the GPS tracking on the ankle monitor indicated that Fortson was not at his approved APA residence but was at another residence located at 960 Snowfall Spur #B, Akron, Ohio 44313 ("960 Snowfall") in violation of the terms of his supervised

---

[2] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

2

release. Todd Liggett, a parole officer with APA since 2005 and a member of the United States Marshals Service ("USMS") Task Force since 2012 ("TFO Liggett") testified that, based on the GPS tracking information, there was no evidence that Fortson ever returned to his APA-approved address during the two days leading up to his arrest.

When Fortson did not report as instructed on March 5, 2022—another supervision violation—the decision was made to proceed to 960 Snowfall and arrest Fortson on his supervision violations. TFO Liggett testified that the decision to arrest Fortson on supervision violations was made by the APA Regional Director, and the USMS Task Force was asked to assist in the arrest and search.[3]

In addition to Fortson's supervision violations (failing to report and changing residences without permission), TFO Liggett had previously been made aware of an on-going investigation into drug trafficking activity involving Fortson. Specifically, he was advised by the Portage County Drug Unit that a man had been observed leaving the 960 Snowfall apartment with narcotics. When a traffic stop of the individual was initiated, he informed the officers that he had just purchased narcotics from Fortson. TFO Liggett was aware that drug traffickers do not typically give the APA the address where they conduct their drug activity, and that they often use weapons to further their drug trafficking. He also testified that from his past dealings with Fortson and familiarity with his past drug trafficking activities, he knew that Fortson used weapons while trafficking.

---

[3] Mr. Rankin could not remember whether officers were sent to 960 Snowfall to locate or arrest Fortson. In fact, Mr. Rankin candidly admitted that he had difficulty remembering many of the details surrounding the March 6, 2019 search and the events leading up to the search. This is not surprising, given the passage of time and the fact that Mr. Rankin subsequently left the APA and did not have access to the reports from the incident to refresh his recollection prior to the hearing. In any event, Mr. Rankin testified that, once he arrived on the scene, more senior APA and USMS Task Force officers, such as TFO Liggett, took the lead. Consequently, the Court found the testimony of TFO Liggett, and Retired U.S. Deputy Marshal Jeff Hall—who both appeared to have better memories of the events of March 6, 2019, and who testified consistently and credibly as to those events—more reliable.

When TFO Liggett arrived at 960 Snowfall to arrest Fortson, he and certain other members of the USMS Task Force went to the front door and knocked and announced themselves but received no answer. Meanwhile, the remaining officers, including U.S. Deputy Marshal Jeff Hall ("Deputy Marshal Hall"), proceeded around to the back of the building. Deputy Marshal Hall, a twenty-year veteran of the USMS,[4] testified that the back of the building sloped downward on a hill with the back door situated at a lower level than the front door. When Fortson was observed moving the blinds in a window in the back of the building, he was instructed to open the back door, which he did, and Deputy Marshal Hall and other task force members entered the apartment.

Deputy Marshal Hall testified that adjacent to the entryway was a bedroom with a sliding glass door, which opened directly into the entryway. Fortson was in the entryway and a female, Jasmine White, was found just inside the adjoining bedroom. Officers separated the two in the bedroom and both were secured. Deputy Marshal Hall placed handcuffs on Fortson.

Officers then conducted a protective sweep of the area immediately adjacent to the entryway for other possible occupants. Because the area in the back of the structure was situated at a lower level than the rooms in the front of the building, and given the information regarding possible drug trafficking at the location, officers were especially concerned that unknown individuals could be hiding in the house ready to launch an armed attack from above. In the bedroom, officers observed in plain view evidence that a man was living there, including men's clothing and numerous boxes of men's shoes. (Government Hearing Exs. 3 (Photograph of Dresser); 4 (Photograph of Dresser); and 5 (Photograph of Shoe Boxes).) The protective sweep also resulted in the discovery of the butt of a gun situated between the mattress and the headboard

---

[4] Deputy Marshal Hall recently retired from the USMS and now works in private security.

4

of the bed. (Government Hearing Ex. 5 (Photograph of Bed and Gun).) The weapon's handle was visible in plain view without the need to manipulate the mattress or the headboard.

Officers then continued their protective sweep to the upstairs to make sure there were no other individuals hiding there. During the sweep, and again in plain view, officers located a bag of marijuana, as well as other items—such as scales, latex gloves, heat sealers, and vacuum sealers— that are indicative of drug trafficking. Shortly thereafter, members of the Portage County Drug Task Force arrived to assist. At some point during the search, a baggie of methamphetamine was discovered in a potato chip bag.

As these events were unfolding, the decision was made to get a search warrant for the premises. Richard Schmitt, an agent with the Drug Enforcement Administration ("DEA Agent Schmitt"), testified that he prepared the application for the search warrant, and that he radioed ahead to the officers at 960 Snowfall when the warrant was approved. (*See* Doc. No. 24-1 (Affidavit in Support of Search Warrant).) In his affidavit, he detailed his year-long investigation into Fortson's suspected drug trafficking activities that involved the utilization of three confidential informants. (*Id.* ¶¶ 8–28.) DEA Agent Schmitt's investigation also included two controlled buys of methamphetamine from Fortson, the second buy, occurring in early January 2019, took place at 960 Snowfall. (*Id.* ¶¶ 13–14, 26.) According to the affidavit, on February 10, 2019, law enforcement also observed an individual leave 960 Snowfall with suspected narcotics. (*Id.* ¶ 18.) A subsequent traffic stop revealed suspected methamphetamine in a sealed potato chip bag. (*Id.*)

DEA Agent Schmitt testified that after he secured the warrant and proceeded to 960 Snowfall, a woman named Annette Rose Sawyer arrived and informed DEA Agent Schmitt that she was a leaseholder of the apartment. She explained that she allowed Fortson and White to use the apartment whenever they wanted. She further indicated that the property and furniture in the apartment belonged to Fortson, and that she did not know anything about any drug activity at the residence.

On September 30, 2021, an indictment issued charging Fortson with distribution of methamphetamine, possession with intent to distribute methamphetamine, and felon in possession of a firearm and ammunition. (Doc. No. 1 (Indictment).)

## II.    LAW AND DISCUSSION

The Fourth Amendment of the United States Constitution grants "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. In his motion, Fortson argues, without any record support, that his Fourth Amendment rights were violated by the APA and the USMS Task Force when they searched 960 Snowfall without a warrant solely because Fortson did not receive the message from his supervising officer that his report time had been changed. The government counters that officers were responding to multiple supervised release violations—including information of Fortson's drug trafficking, failure to seek permission before changing addresses, and failure to report as ordered—and therefore, the search was a valid search of a probationer under relevant Supreme Court precedent. Alternatively, the government argues that the search was a lawful protective sweep that was conducted with articulable facts, and that, in any event, the drug evidence seized would have inevitably been discovered during the course of the DEA's drug trafficking

investigation. The Court finds that the search can be justified under any of these theories.

### A. The Search Was a Valid Search of a Probationer

"A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987). But the "nature of the relationship between state actors and individuals subject to state supervision in lieu of or following release from prison alters the relevant analysis under the Fourth Amendment." *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007); *see Griffin*, 483 U.S. at 873–74; *United States v. Knights*, 534 U.S. 112, 119, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001). In *Griffin* and *Knights*, the Supreme Court created "two distinct analytical approaches under which a warrantless probationer search may be excused" and still meet the requirements of the Fourth Amendment. *Herndon*, 501 F.3d at 688 (citation omitted).

#### 1. Griffin "Special Needs" Test

In *Griffin*, the Supreme Court recognized that "a State's operation of a probation system creates 'special needs' 'beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.'" *United States v. Brown*, 832 F. App'x 397, 399 (6th Cir. 2020) (quoting *Griffin,* 483 U.S. at 874). "The Court reasoned that, 'probation serves as a period of genuine rehabilitation' and reduces the chances of recidivism, creating a 'special need' that allows warrantless searches by the State in administering its probation system." *Id*. (quoting *Griffin*, 483 U.S. at 875) (citing *United States v. Sweeney*, 891 F.2d 232, 236 (6th Cir. 2018)). This test involves a two-part inquiry. "'First, courts examine whether the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement. If so, courts then analyze whether the facts of the search itself satisfy the regulation

7

or statute at issue.'" *United States v. Fletcher*, 978 F.3d 1009, 1015 (6th Cir. 2020) (quoting *United States v. Loney*, 331 F.3d 516, 520 (6th Cir. 2003)).

### 2. Knights "Totality of the Circumstances" Test

"In 2001, the Supreme Court moved away from the 'special needs' doctrine and upheld the search of a probationer's residence based on only reasonable suspicion arising from the totality of the circumstances of the search, which included the probationer's acceptance of a search condition under the terms of his probation." *Brown*, 832 F. App'x at 399 (citing *Knights*, 534 U.S. at 122). Today, if a search satisfies either test, the district court need not address the other. *See United States v. Payne*, 588 F. App'x 427, 431 (6th Cir. 2014) (citing *Herndon*, 501 F.3d at 688). The Court finds that the search of the 960 Snowfall residence is justified under either Supreme Court test.

Under the first prong of the *Griffin* test, the relevant Ohio statute, Ohio Rev. Code § 2951.02(A), provides for the warrantless search of a probationer and any property in which he has an interest if the "probation officers have reasonable grounds to believe that the offender is not abiding by the law or otherwise is not complying with the conditions of . . . the felony offender's nonresidential sanction." *Id.* The Sixth Circuit has previously determined that this statute satisfies the reasonableness requirement. *See Fletcher*, 978 F.3d at 1015. Turning to the second prong, the Court finds that the search in question satisfied the search provision in the statute because officers had "reasonable cause" to believe that Fortson was violating his probation order by trafficking narcotics, living at an unapproved address, and failing to report as ordered. *See, e.g., United States v. Black*, No. 3:07-cr-93(1)(2), 2008 WL 53690, at *2 (S.D. Ohio Jan. 2, 2008) (search of probationer satisfied special needs test where officers had reasonable suspicion from data from

8

GPS tracker in defendant's ankle monitor that defendant was residing at a residence other than his approved residence).

Though it need not proceed to the alternative test, the Court finds that these same facts satisfy *Knights*' "totality of the circumstances" analysis because there was reasonable suspicion that Fortson was violating various supervision conditions or was engaged in criminal activity, specifically, drug trafficking.

While Fortson argues in his motion that his failure to report as ordered was a mere pretext for searching the residence, the evidence from the hearing did not support this argument. Moreover, in any event, the officers at the hearing testified credibly that Fortson was in violation of several conditions of his supervised release, including the failure to report. And to the extent that Fortson argues that the DEA involved the APA so that they could search the residence to advance the federal drug investigation—sometimes referred to in the case law as a "stalking horse"—that argument lacks merit. The Sixth Circuit has recently concluded that "the 'stalking horse' caveat, if it survives *Knights* at all, does not apply when a probationer is subject to a valid search provision and law-enforcement officers have a reasonable suspicion that the probationer is engaging in illegal activity." *United States v. Ickes*, 922 F.3d 708, 712 (6th Cir. 2019). Here, the multiple supervision violations gave officers reasonable suspicion to search 960 Snowfall and the

search is, therefore, valid under either the *Griffin* or *Knights* test.[5]

### B. The Search Was a Valid Protective Sweep

Alternatively, the Court finds that the search constituted a valid protective sweep of the residence. The Sixth Circuit recently discussed the law regarding protective sweeps:

> There are two types of protective sweeps. "The first type allows officers to 'look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" [*United States v.*] *Archibald*, 589 F.3d [289,] 295 (quoting *Maryland v. Buie*, 494 U.S. 325, 334, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990)). This "first type of sweep requires no probable cause or reasonable suspicion." *Id*. "The second type of sweep goes 'beyond' immediately adjoining areas but is confined to" "'protective sweep[s] [that are] aimed at protecting the arresting officers[.]'" *Id*. (third alteration in original) (citation omitted). It requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id* (citation omitted). This second kind of sweep, however, is "not a full search of the premises," instead it "extend[s] only to a cursory inspection of those spaces where a person may be found" and must last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. (citation omitted).

*United States v. Vanhook*, 858 F. App'x 892, 894–95 (6th Cir. 2021); *see United States v. Cammon*, 849 F. App'x 541, 545 (6th Cir. 2021).

When they first entered the apartment, the officers were aware of articulable facts

---

[5] Noting that 960 Snowfall was not Fortson's APA-approved address, Fortson's counsel argued that the APA violated the Ohio Department of Rehabilitation and Correction policy relating to the search of non-APA residences. (*See* Defendant's Hearing Ex. 1 (APA Search and Arrest Procedures).) While the government has the burden of demonstrating that the search was conducted pursuant to standardized procedures, *United States v. Richards*, 147 F. Supp. 2d 786, 789 (E.D. Mich. 2001); *see also Colo. v. Bertine*, 479 U.S. 367, 373, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987), technical violations do not justify suppression. *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (rejecting argument that inventory search was pretextual because no inventory report was generated, the court observed that "[a]lthough compliance with procedures tends to ensure the intrusion is limited to carrying out the government's caretaking function, failure to follow through with standard procedures does not necessarily render the search unreasonable" (quotation marks and citation omitted)). Moreover, officers had reasonable suspicion to believe that Fortson was violating the terms of supervised release, including residing at the non-APA-approved residence. *See, e.g., Black*, 2008 WL 53690, at *2 (rejecting similar argument that probation officer could not search a non-approved residence as there was evidence that parolee was living there without permission).

necessary to conduct a more expansive sweep of the entire structure. The officers possessed information that Fortson had recently engaged in drug trafficking from the residence. TFO Liggett testified that his past dealings with Fortson suggested that other armed individuals could be at the residence. In addition, the fact that the building was built into the side of a hill added an extra dimension of danger to the search. TFO Liggett and Deputy Marshal Hall both testified they are always concerned that unknown and armed individuals may be hiding in a residence that is known to be the site of drug trafficking. This concern, they testified, was heightened here due to the unusual layout of the apartment, which placed the rooms in the back of the building at a lower level than the front, making the possibility of an attack from above more dangerous and more likely.

At a minimum, however, the evidence at the hearing demonstrated that the bedroom where the weapon was discovered was directly adjacent to the area where Fortson was arrested. "Because *Buie* grants officers the right to automatically inspect 'spaces immediately adjoining' the place of arrest 'from which an attack could be immediately launched,' officers were entitled to conduct a protective sweep of the adjoining bedroom and seize any contraband found in plain view." *Cammon*, 849 F. App'x at 546. Once officers swept the bedroom, they had the additional articulable fact of the discovery of a weapon to support a more comprehensive sweep of the apartment. And when the officers had completed their protective sweep of the entire apartment, they had discovered in plain view more than sufficient evidence of drug trafficking to support the issuance of a search warrant.

### C. The Inevitable Discovery Doctrine Applies to the Search

Of course, even the most generous interpretation of the law regarding protective sweeps

would not support the opening of a sealed potato chip bag, as it is not reasonable to believe that an individual could be hiding in such a small container. *See United States v. Biggs*, 70 F.3d 913, 915 (6th Cir. 1995) (noting that protective sweeps are limited to "a cursory visual inspection" of places where a person could hide); *see generally United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001) ("[Once a protective sweep uncovers evidence that demonstrates] probable cause to believe contraband is present, [an officer] must obtain a search warrant before he can proceed to search the premises." (citation omitted)). Since it appears that the methamphetamine was found before the warrant was secured, the Court will also address the doctrine of inevitable discovery.[6] (*See* Doc. No. 24-1 ¶ 33.)

The inevitable discovery doctrine constitutes an exception to the exclusionary rule that permits the district court to "admit illegally obtained evidence if the evidence would inevitably have been discovered through independent, lawful means." *United States v. Christian*, 39 F. Supp. 3d 942, 950 (N.D. Ohio 2014) (citing *United States v. Alexander*, 540 F.3d 494, 502–03 (6th Cir. 2008) (evidence admissible despite illegal treatment of defendant because evidence would have been discovered properly based on investigation and search warrant)). This doctrine applies where "the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Keszthelyi*, 308 F.3d 557, 573–74 (6th Cir. 2002) (emphasis in original) (quotation marks and citation omitted). The government's burden of proof is a preponderance of the evidence. *Nix v. Williams*,

---

[6] The Court notes that, for reasons already discussed, the opening of the chip bag would still have been justified as part of a valid search of a probationer who was suspected of supervised release violations, including drug trafficking. Still, in an abundance of caution, the Court will also address the government's third basis for finding the search valid.

467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

Here, the affidavit prepared by DEA Agent Schmitt provided that the DEA had been investigating Fortson for over a year for his alleged involvement as a member of the drug trafficking organization known as "MONEY MOB." (Doc. No. 24-1 ¶¶ 11, 24.) This investigation included a control buy at 960 Snowfall and information gleaned from three different confidential informants. (*See, e.g., id*. ¶¶ 13–14, 19, 26.) In particular, one confidential informant provided credible information that Fortson had been involved in drug trafficking activities as late as February 24, 2019, less than two weeks before the search. (*Id*. ¶ 10; *see also id*. ¶¶ 11, 18, 19.) The investigation also included an observed drug trafficking transaction involving Fortson at the 960 Snowfall apartment within 30 days of the issuance of the warrant. (*Id*. ¶ 18.) Significantly, the suspected methamphetamine that was the subject of this drug sale was concealed in a sealed potato chip bag. (*Id*.) Further, the affidavit contained numerous paragraphs describing Fortson's suspected drug activity at 960 Snowfall. (*See, e.g.*, *id*. ¶¶ 21, 28.) While the affidavit makes brief reference to Fortson's supervised release violations and the items discovered by officers on March 6, 2019 (*see id*. ¶¶ 29–33), the information provided in the affidavit—even without *any* reference to the events of March 6, 2019—would have been sufficient to support the issuance of the search warrant, as it provided evidence of sufficient recent drug activity by Fortson at the residence to be searched. *See United States v. Jones*, 159 F.3d 969, 974–75 (6th Cir. 1998) (finding probable cause where confidential informant made drug purchase from residence, defendant was at the residence during monitored drug transactions, and defendant was observed possessing cocaine).

Based on the DEA's investigation as detailed in the search warrant application, the Court finds that the methamphetamine located in a chip bag would have inevitably been discovered by

13

the DEA. Accordingly, the Court finds that the inevitable discovery doctrine provides an additional reason to uphold the entirety of the search and deny Fortson's motion.

### III. CONCLUSION

For all the foregoing reasons, Fortson's motion to suppress (Doc. No. 21) is DENIED.

**IT IS SO ORDERED**.

Dated: November 23, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**