# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:21-cr-684 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| JOSHUA FORTSON, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the motion of defendant Joshua Fortson ("Fortson") for a new trial and to reopen the suppression hearing. (Doc. No. 122 (Motion); *see* Doc. No. 126 (Sealed Exhibits); Doc. No. 129 (Supplement).) Plaintiff United States of America (the "government") opposes the motion (Doc. No. 132 (Response)), and Fortson has filed a reply. (Doc. No. 133 (Reply).) For the reasons set forth herein, the motion is denied.

## I.     BACKGROUND

On September 30, 2021, an indictment issued charging Fortson with distribution of methamphetamine (Count 1), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii); possession with intent to distribute methamphetamine (Count 2), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii); and being a felon in possession of a firearm and ammunition (Count 3), in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. No. 1 (Indictment).) Counts 2 and 3 were based on evidence discovered during the March 6, 2019, search of a residence located at 960 Snowfall Spur

#B, Akron, Ohio 44313 ("960 Snowfall").[1]

Throughout the course of these proceedings, Fortson has been represented by several different attorneys. Immediately following Fortson's arrest on October 4, 2021, the magistrate judge appointed Assistant Federal Public Defender ("FPD") Carolyn M. Kucharski to represent Fortson. (Order [non-document], 10/4/2021.) On October 22, 2021, Attorney Kevin Cafferkey entered an appearance, advising that he had been retained by Fortson. (Doc. No. 13 (Notice of Appearance).) Attorney Cafferkey filed a number of notices and motions on behalf of Fortson, including a motion to suppress all evidence derived from the search of the 960 Snowfall residence. (Doc. No. 21 (Suppression Motion); *see* Doc. No. 22 (Memorandum in Support).)

At the time of the search, Fortson was serving a term of supervision in connection with state law convictions for sexual battery and drug trafficking. In the suppression motion, Fortson (through counsel) argued that the warrantless search of the 960 Snowfall residence violated his Fourth Amendment rights because Fortson was arrested on a "hyper technical violation of his parole—*to wit*: failing to contact his parole officer within less than 24 hours"—and because there was no basis to perform a protective sweep. (Doc. No. 22, at 7.) As to the former, Fortson argued that he never received the message from his probation officer that he was to report for a check of his location monitoring ankle bracelet and could not, therefore, be considered to have failed to report. (*Id*. at 1–2.) Additionally, while he conceded that he was not at his Adult Parole Authority ("APA") approved residence at the time of his arrest, he argued he was lawfully present at the 960 Snowfall property as an overnight guest of his girlfriend. Accordingly, Fortson insisted that "any

---

[1] Count One was premised on an April 29, 2018, controlled buy, and was unrelated to any items seized during the March 6, 2019, search of 960 Snowfall. (*See* Doc. No. 132, at 4.)

search of a premises and/or location not the offender's approved residence require[d] a warrant[.]" (Doc. No. 22, at 4.)

The government countered that officers were responding to multiple parole violations by Fortson (not just the failure to report violation), including possible drug trafficking, and failing to seek permission before changing his address to the 960 Snowfall address and, therefore, the search was a valid search of a probationer at his residence under Ohio law and relevant Supreme Court precedent. (Doc. No. 24 (Response to Suppression Motion), at 11–15.) Alternatively, the government argued that the search was a lawful protective sweep, and that, in any event, the evidence seized would have inevitably been discovered because the search warrant officers ultimately obtained after Fortson's arrest on March 6, 2019, was supported by probable cause. (*Id.* at 16–19.)

On October 12, 2022, the Court conducted an evidentiary hearing on the suppression motion, during which the Court heard testimony from two members of the Portage County Drug Task Force (hereinafter "task force") and Fortson's then-APA Parole Officer, Chad Rankin. At the conclusion of the hearing, the Court took the matter under advisement. (Minutes of Proceedings [non-document], 10/12/2022.) The Court issued its ruling on November 23, 2022, denying the motion to suppress. (Doc. No. 31 (Memorandum Opinion).) In its decision, the Court found that the search was a valid search of a probationer under Ohio statutory law and two separate Supreme Court tests because there was evidence that Fortson had violated several conditions of his supervision, including residing at a non-APA approved residence. (*Id.* at 7–10.) The Court also found reason for officers to believe that Fortson was residing at the 960 Snowfall residence at the time of his arrest. (*Id.* at 10 n.2.) Additionally, the Court determined that the firearm, which was

found in plain view in a bedroom, was located during a valid protective sweep of the residence. (*Id*. at 10–11.) Finally, the Court concluded that the remaining evidence, including drugs found in a sealed chips bag, would have inevitably been discovered when the officers executed the subsequently obtained search warrant supported by the Drug Enforcement Agency's ("DEA's") drug trafficking investigation into Fortson and the 960 Snowfall residence. (*Id*. at 11–14.)

On January 30, 2023, Attorney Cafferkey moved to withdraw as counsel, citing the fact that Fortson had retained new counsel. (Doc. No. 36 (Motion to Withdraw).) The Court granted Attorney Cafferkey's motion, and Attorney Kimberly Kendall entered an appearance on behalf of Fortson. (Doc. No. 37 (Notice of Appearance); Order [non-document], 1/31/2023.) After the Court granted new counsel's motion to continue the dates and deadlines in the case (Doc. No. 39 (Motion to Continue); Doc. No. 41 (Order to Continue)), Attorney Kendall proceeded to diligently represent Fortson, filing numerous pretrial motions and defending him at trial. (*See, e.g*., Doc. No. 54 (Motion in Limine); *see* Doc. No. 38 (Discovery Notice).) After receiving the jury's guilty verdicts, the Court ordered the preparation of a Presentence Investigation Report ("PSR") and set sentencing for March 25, 2024 (and then later reset sentencing for March 28, 2024, due to a scheduling conflict). (Minutes of Proceedings [non-document], 12/1/2023; Notice [non-document], 3/12/2024; *see* Doc. No. 88 (Verdicts).)

On March 12, 2024, less than two weeks before the sentencing hearing, Attorney Kendall and her co-counsel moved for leave to withdraw. (Doc. No. 95 (Motion to Withdraw).) At the hearing on the motion to withdraw, Fortson stated that he had decided that he could no longer work with current counsel, and that he wished to retain new counsel. (Doc. No. 117 (Transcript of Motion Hearing), at 7, 14.) Attorney Kendall confirmed that she and her client had reached an

4

impasse, as Fortson wished to file certain unidentified post-trial motions and it was Attorney Kendall's professional assessment that the proposed motions should not be filed. (*Id*. at 3–5.) Notwithstanding the Court's concern that Fortson was again seeking new counsel, this time at the end of the case and immediately before sentencing, the Court granted the motion to withdraw and rescheduled sentencing for April 15, 2024. (*Id*. at 10–15; Order [non-document], 3/14/2024; Notice [non-document], 3/14/2024; Order [non-document], 3/18/2024.).

When Fortson was unable to retain counsel, the Court appointed the Federal Public Defender's Office to represent Fortson at sentencing. (Order [non-document], 4/15/2024; Doc. No. 101 (CJA Financial Affidavit).) The following day (April 16, 2024), newly appointed counsel, First Assistant FPD Jacqueline A. Johnson, moved for a 120-day continuance of the sentencing hearing because she needed "additional time to review the Presentence Report and prepare additional objections." (Doc. No. 102 (Motion for Continuance), at 1.) "In addition to the time needed to review and prepare objections to the Presentence Report," counsel indicated that she needed time "to obtain and review hearing and trial transcripts, review discovery, conduct any investigations, meet with Mr. Fortson, and prepare a sentencing memorandum." (*Id*.) The motion made no mention of the possibility of filing untimely post-trial motions. The Court granted the motion and reset the sentencing hearing for August 30, 2024. (Order [non-document], 4/17/2024.)

On August 23, 2024, less than a week before the rescheduled sentencing hearing and after the majority of the 120-day continuance had expired, appointed counsel filed a motion to vacate the sentencing hearing and set the matter for a status conference. (Doc. No. 119 (Motion to Vacate).) In this motion, new counsel—for the first time—advised the Court that she was considering the possibility of filing post-trial motions, though counsel did not indicate what those

motions might be. (*Id*. at 2.) Counsel requested that the Court set a deadline in the next 30 days, at which time counsel proposed she would update the Court on the status of her review and whether she had made a final determination as to the filing of post-trial motions. (*Id*. at 1–2.) The Court granted the motion to vacate, in part, canceling the sentencing hearing and directing counsel to file a status report by September 30, 2024. The Court also rescheduled sentencing for October 15, 2024. (Order [non-document], 8/23/2024.)

On September 30, 2024, counsel filed a status report, wherein she informed the Court she had only recently received the file from former counsel and had concluded, upon review, "there is a meritorious post-trial motion that should be filed and requests seven days, until October 7, 2024, to do so." (Doc. No. 120 (Status Report), at 2.) She also requested a further continuance of the sentencing hearing. (*Id*.; *see* Doc. No. 121 (Motion to Continue Sentencing).) The Court granted the motion, setting October 8, 2024, for the still unidentified post-trial motion and reset sentencing for December 17, 2024. (Order [non-document], 10/1/2024.)

Defense counsel filed the present motion for a new trial on October 7, 2024. Contemporaneous with the filing of the motion for a new trial, counsel filed a motion for a seven-day extension of time to file a supplement to the motion. (Doc. No. 124 (Motion for Leave to Supplement).) The Court granted Fortson leave to file a supplement by October 15, 2024, and established dates for the remainder of the briefing on the motion. (Order [non-document], 10/8/2024.) Given that the parties were engaged in motion practice, the Court continued the sentencing hearing until after the post-trial motion was resolved. (Order [non-document], 10/15/2024.)

## II.   LAW AND DISCUSSION

Fortson seeks a new trial claiming he received ineffective assistance from his former counsel during the litigation of his suppression motion. Specifically, Fortson cites two alleged deficiencies in Attorney Cafferkey's performance: (1) counsel should have argued that the search of the third-party residence was unconstitutional because officers did not first secure an arrest warrant; and (2) counsel should have requested a *Franks* hearing. (Doc. No. 122, at 1–2.) Fortson also requests leave to reopen the suppression hearing so that new counsel may question former APA Parole Officer Rankin about disciplinary action taken against him, notes Rankin made in Fortson's APA file, and an APA supervisor's perception of the task force's reputation. (*Id*. at 13; Doc. No. 129, at 1–2, 6–7.)

It is the government's position that the motion for a new trial is untimely under Fed. R. Crim. P. 33(b) and that, in any event, the issues raised in the motion are more appropriately raised in a motion to vacate under 28 U.S.C. § 2255. (Doc. No. 132, at 6–8.) The government further maintains that Fortson waived any unarticulated suppression arguments under Fed. R. Crim. P. 12(b)(3), rendering inappropriate Fortson's request to reopen those proceedings. (*Id*. at 7–8.) Further, even if the Court were to reach the merits, the government argues that Fortson received effective assistance from counsel at the suppression hearing, and that there was no prejudice because the Court had already determined that the evidence discovered during the March 6, 2019, search would have been inevitably discovered by the task force officers once they executed the search warrant. (*Id*. at 8–13.) Finally, the government rejects Fortson's claim that there was any legitimate basis for a *Franks* hearing. (*Id*. at 13–15.)

### A.  Motion for a New Trial

#### 1.  Timeliness under Rule 33(b)

Fortson does not seriously dispute that his motion for a new trial is untimely. Under the plain language of Rule 33(b)(2), "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). Fortson's motion for a new trial is not based on newly discovered evidence. Rather, it is based on an argument that Attorney Cafferkey—Fortson's first retained counsel—was ineffective. "[A]n ineffective assistance of counsel claim cannot be considered newly discovered evidence for the purpose of a motion for new trial." *United States v. Munoz*, 605 F.3d 359, 367 (6th Cir. 2010) (quoting *United States v. Seago*, F.2d 482, 488–89 (6th Cir. 1991)). The jury returned its verdicts on December 1, 2023. (Doc. No. 89.) The motion for a new trial was not filed until October 7, 2024, more than ten months after the verdicts.

But Fortson notes that the Court can extend the deadline. Rule 45(b) allows a district court, upon a party's motion, to extend a filing deadline "if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). The Sixth Circuit considers the following factors "for assessing excusable neglect under Rule 33:"

> (1) danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith.

*United States v. Hall*, 979 F.3d 1107, 1123 (6th Cir. 2020) (quoting *Munoz*, 605 F.3d at 368 (further quotation marks and citations omitted)).[2] Of these, the reason for the delay carries the most weight.

---

[2] These factors were first announced by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates*, 507 U.S. 380, 388, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993), and used to interpret "excusable neglect" in the context of Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure. The *Pioneer* factors have subsequently

*Munoz*, 605 F.3d at 372 (citations omitted).

Two cases provide this Court with guidance for its consideration of an untimely Rule 33 motion filed by new counsel. In *Munoz*, several months after the jury's verdict, the district court granted trial counsel's motion to withdraw, and new counsel entered an appearance on behalf of defendant. Within two weeks of appearing, newly appointed counsel requested leave to file a motion for a new trial. The court denied the motion but permitted counsel to file a new motion demonstrating that the late filing was the result of excusable neglect. Thereafter, new counsel filed a second motion for a new trial, citing ineffectiveness of trial counsel. The district granted the motion, finding excusable neglect. *Munoz*, 605 F.3d at 366.

Applying the relevant factors, the Sixth Circuit affirmed the district court's decision. With respect to the critical factor—reason for delay—the Sixth Circuit found that the fact that the allegedly ineffective counsel was still representing the defendant at the time the Rule 33 motion was due was a "valid reason for the delay[.]" *Id*. at 371. Reasoning that an attorney was unlikely to file a motion asserting his own ineffectiveness, the court determined that the defendant should not be penalized for trial counsel's failure to file such a motion.

In *United States v. Elenniss*—another case involving an untimely motion for a new trial based on ineffective assistance of trial counsel and filed by subsequently appointed counsel—the Sixth Circuit focused on the delay *after* new counsel was appointed before the motion was filed. There, the court observed that new counsel waited two months after entering an appearance to file the motion without first moving for an extension of time. While the court noted that the defendant

---

been employed in a variety of other contexts, including criminal proceedings. *See, e.g., Stutson v. United States*, 516 U.S. 193, 195–97, 116 S. Ct. 600, 133 L. Ed. 2d 571 (1996) (applying the *Pioneer* factors to Fed. R. App. P. 4(b), which governs when a late notice of appeal may be filed).

had a valid reason for not filing the motion during the time trial counsel was still representing him, he could not justify the two month delay after new counsel entered an appearance. After considering all the relevant factors, the court agreed that the district court properly denied the defendant's untimely motion for a new trial. 729 F. App'x 422, 428 (6th Cir. 2018).

The procedural posture in the present case presents an even less compelling case for excusable neglect than either *Munoz* or *Elenniss*. Here, the Rule 33 motion is premised on the alleged ineffectiveness of Fortson's first retained counsel, Attorney Cafferkey, with respect to pretrial proceedings. Yet, by the time this case went to trial, Attorney Kendall was counsel of record, and she was counsel of record well before this time.[3] Fortson was, therefore, no longer represented by the counsel (Attorney Cafferkey) he now claims was ineffective when the time for filing a Rule 33 motion began to run. When asking to withdraw as counsel, Attorney Kendall represented that she considered the propriety of filing post-trial motions and determined that there was no legitimate basis for doing so. Presumably she conducted a similar analysis relative to the filing of any pretrial motions. Fortson has not alleged that Attorney Kendall was ineffective, so there is no basis for excluding the period of time prior to the appointment of the FPD.

But even if the Court excused this period, the FPD's subsequent, lengthy delay is inexcusable. New counsel waited six months before requesting leave to file a motion for a new trial. And even when the FPD finally put the Court on notice that it was a considering a possible

---

[3] The hearing on the motion to suppress took place on October 12, 2022, and the Court issued its decision denying the motion on November 23, 2022 (Doc. No. 31). By letter filed on January 27, 2023 (Doc. No. 33), Fortson advised the Court that he had retained new counsel. On January 30, 2023, Attorney Cafferkey filed a motion to withdraw as counsel (Doc. No. 36), and new counsel, Attorney Kendall, filed a notice of appearance (Doc. No. 37). The jury trial did not commence until November 27, 2023, nearly ten months after new counsel was retained.

post-trial motion, counsel delayed another six weeks before filing the motion for a new trial.[4] New counsel's only justification for the delay is that she eventually sought leave to file a post-trial motion and the Court provided dates for the briefing of the motion. (Doc. No. 133, at 1.) Yet, in setting a briefing schedule, the Court did not rule on the timeliness of the motion, and the government has now challenged the motion on these grounds. While it certainly would have taken some time for new counsel to learn the record, counsel waited nearly six months before it even apprised the Court of the possibility of a post-trial motion and waited another six weeks before the motion was filed.[5] Under these circumstances, the Court cannot find that the "length of the delay" and the "reason for the delay" factors weigh in Fortson's favor.

Nor can the Court find that the delay was beyond Fortson's control. As noted, Fortson was never prevented from filing the Rule 33 motion by an attorney unlikely to assert his own ineffectiveness. Rather, Fortson had reasonable control over the delay both before and after the FPD was appointed. *See Hall*, 979 F.3d at 1126 (noting that the defendant "had reasonable control over the five-month period during which trial counsel was no longer in the picture"). This factor also does not weigh in favor of excusing the delay.

The lengthy delay also impacted the judicial proceedings. The Court was within a week of sentencing, and had already received the PSR when Fortson decided yet again that he could no longer work with Attorney Kendall (his second retained attorney). New counsel delayed several more months before the motion was filed. While new counsel eventually put the government and

---

[4] Even then, new counsel sought an additional extension of time to file a supplement, further delaying the Court's consideration of the motion.

[5] This not a complex case. Not including jury selection, the presentation of evidence lasted fewer than three days. Additionally, the hearing on the motion to suppress lasted under three hours. It would not have taken new counsel an inordinately long time to review the transcripts in the case.

the Court on notice that she was considering a post-trial motion, she did so only after leading the Court and the government to believe that she was preparing for sentencing. Still, while the Court has been required to continue sentencing several times to accommodate Fortson and his counsel, the Court acknowledges that the sentencing hearing has not yet taken place and no appeal has been taken. Under these circumstances, the impact on judicial proceedings is arguably reduced. *See Hall*, 979 F.3d at 1126 (finding "minimal" impact on judicial proceedings where the defendant was "a week away from sentencing when her newest counsel filed the Rule 33 motion," the sentencing hearing had yet to take place, and no appeal had been filed). This factor is either neutral or weighs only slightly against Fortson.

The government has not argued that it has been prejudiced by the delay, nor could it. The government would have had to address the suppression arguments discussed in the present motion had they been advanced by prior counsel. There is also no evidence of bad faith. "Aside from its tardiness, [the defendant] had every right to file this motion." *Hall*, 979 F.3d at 1126 (quoting *Elenniss*, 729 F. App'x at 428. Accordingly, the last two factors—prejudice to the nonmoving party and bad faith—weigh in Fortson's favor.

Even though some of the factors are either neutral or weigh in Fortson's favor, the rest of the factors, including the most important factor (reason for the delay), counsel against excusing the delay. Accordingly, the Court finds that the motion is untimely and is denied for this reason alone. Additionally, the Court finds that the ineffectiveness arguments contained in the Rule 33 motion are better reserved for a motion seeking habeas relief under 28 U.S.C. § 2255, given that final judgment has not been entered and the record is not yet complete. *See Elenniss*, 729 F. App'x at 430 (noting that a Rule 33 motion "is not the proper forum" for ineffective assistance of counsel

claims (citing *Massaro v. United States*, 538 U.S. 500, 504, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003)).

### 2. *Ineffective Assistance of Counsel*

Yet, if the Court were to reach the merits, the motion would still be denied because Fortson has failed to demonstrate that he received ineffective assistance of counsel at the suppression hearing. "To prevail on an ineffective-assistance-of-counsel claim, [a petitioner] must satisfy the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)." *Wingate v. United States*, 969 F.3d 251, 255 (6th Cir. 2020). Specifically, the petitioner must demonstrate: (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687–88; *see also Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The court may address the *Strickland* prongs in any order and need not address both prongs if the petitioner "makes an insufficient showing on one." *See Wingate*, 969 F.3d at 955 (quotation marks and citation omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Judicial scrutiny of counsel's performance must be highly deferential[.]" *Strickland*, 466 U.S. at 689. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* Counsel's performance must be evaluated from the perspective existing at the time of the representation, not from the perspective of hindsight. *Id.* Indeed, a prisoner must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment, and that counsel's errors were so

13

serious as to deprive him of a fair trial. *Strickland*, 466 U.S. at 687–88; *United States v. Hanley*, 906 F.2d 1116, 1120–21 (6th Cir. 1990); *Flippins v. United States*, 808 F.2d 16, 18 (6th Cir. 1987); *see also United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) ("Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." (citing *Strickland, supra*)).

Fortson maintains that Attorney Cafferkey should have argued that the search of the 960 Snowfall property was unconstitutional because it represented an intrusion into a third-party residence without an arrest warrant. As an initial matter, the government argues that prior counsel *did* raise this argument, as he specifically stated in the memorandum in support of his suppression motion that "any search of a premises and/or location not the offender's residence requires a warrant." (Doc. No. 132, at 10 (quoting Doc. No. 22 (Supporting Memorandum), at 4).) Trial counsel's argument, however, was limited to an APA policy that requires a warrant, exigent circumstances, or consent before a premises that is not the offender's residence is searched. (*See* Doc. No. 22, at 4 (citing APA policy); *see also* Defendant's Hearing Ex. 1 (APA Search and Arrest Procedures).) In rejecting this argument, the Court determined that any technical violation of APA policy did not rise to the level of a constitutional violation. (Doc. No. 31, at 10 n.5 (collecting cases).) And in any event, the Court found that there was no violation because officers had at least reasonable suspicion to believe that Fortson was using 960 Snowfall as his residence. (*See id*.)

As the Court understands the present motion, Fortson is not challenging the purported violation of the APA policy. Rather, his new argument appears more nuanced. He begins by acknowledging (as he must) that parolees have limited Fourth Amendment protections, and he appears to concede that as a probationer or parolee he was subject to a warrantless search and/or

arrest in his own residence. (Doc. No. 122, at 5.) Still, because he was not arrested at his APA-approved residence, he now argues that the Fourth Amendment required officers to have an arrest warrant and probable cause to believe that he was inside before they could enter. (*Id*. at 8 (citing, among authority, *United States v. Buckner*, 717 F.2d 297, 300 (6th Cir. 1983)).) Fortson cannot establish either prong of the *Strickland* standard because had prior counsel made this argument at the hearing, it would have failed.

As the Court observed in its original ruling, as a parolee, Fortson was subject to Ohio Rev. Code § 2951.02(A)(3)(a), which permitted searches of his person or residence, with or without a warrant, if the officer had "reasonable grounds to believe that the offender is not abiding by the law or is not otherwise complying with the conditions of the offender's community control sanction or nonresidential sanction."[6] The Court found that the warrantless search under § 2951.02 satisfied the Supreme Court's "special needs" test for permitting the warrantless search of a probationer because the statute itself satisfied the reasonableness requirement and because "officers had 'reasonable cause' to believe that Fortson was violating his probation order by trafficking narcotics, living at an unapproved address, and failing to report as ordered." (Doc. No. 31, at 8 (citing, among authority, *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 97 L. Ed. 2d 497 (2001) (setting forth the "special needs" test)).)[7]

---

[6] The Court also observed that Fortson was subject to Ohio Rev. Code § 2967.131. (Doc. No. 31, at 2.) Section 2967.131 contains similar language and provides the parole officer with authority to "search, with or without a warrant, the person of the individual or felon, the place of residence of the individual or felon" or other property of the individual if the parole officer has reason to believe that the individual is not abiding by the law or is in violation of a term of supervision. § 2967.131(C)(1).

[7] Even though it was not required to do so, the Court also determined that the search was lawful under the "totality of the circumstances" test announced in *United States v. Knights*, 534 U.S. 112, 119, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001). Applying this test, the Court concluded that there was reasonable suspicion that Fortson was "violating various supervision conditions or was engaged in criminal activity, specifically, drug trafficking." (Doc. No. 31, at 9.)

But Fortson argues that the government also had to demonstrate that the officers had probable cause to believe that Fortson resided at 960 Snowfall. (Doc. No. 122, at 4–8.) The Sixth Circuit has left open the question of whether "reasonable suspicion connecting a parolee or probationer to the premises to be search would be sufficient under the balancing" tests announced by the Supreme Court. *See United States v. Payne*, 588 F. App'x 427, 433 (6th Cir. 2014).[8] The Court need not wade into these murky waters to resolve the present motion because the officers had probable cause to believe that Fortson was residing at 960 Snowfall. *See, e.g., United States v. Rogers*, No. 2:19-cr-20116, 2021 WL 825988, at *5 (W.D. Tenn. Mar. 4, 2021) (declining to reach the legal question because the record supported a finding that the officers had probable cause to believe that the probationer was residing at the residence that was searched (citing *Payne*, 588 F. App'x at 433)).

At the suppression hearing, Task Force Officer ("TFO") Todd Liggett testified that, prior to the time he proceeded to 960 Snowfall to effectuate Fortson's arrest for violating the terms of his supervised release, he had been made aware of the DEA's investigation into Fortson's alleged drug trafficking activities at 960 Snowfall. (*See, e.g.*, Doc. No. 46 (Transcript of Suppression Hearing), at 23–24.) The details of the investigation were subsequently included in the affidavit of DEA Special Agent Richard Schmitt (who was also involved in the search and testified at the hearing),which supported the search warrant that officers eventually sought in connection with the 960 Snowfall residence. (*See* Doc. No. 132-1 (Warrant Affidavit).) Specifically, from surveillance,

---

[8] Because the law in the Sixth Circuit remains unresolved regarding the necessary burden of proof connecting the probationer to the residence to be searched under *Griffin* and *Knights*, prior counsel cannot be considered ineffective for failing to raise it for this reason alone. *See United States v. Conley*, 290 F. Supp. 3d 647, 660 (E.D. Ky. 2017) (failure to address unsettled law was not ineffectiveness (citing, among authority, *Thompson v. Warden*, 598 F.3d 281, 288 (6th Cir. 2010))); *see also Nichols v. United States*, 563 F.3d 240, 253 (6th Cir. 2009) (en banc) (failure to anticipate change in the law did not violate *Strickland*).

controlled drug buys, traffic stops, and confidential informants, the DEA learned that Fortson sold drugs out of the 960 Snowfall residence and that he was routinely seen driving a black Lexus associated with the residence. Further, utility records showed that Fortson's father was the account holder for services to the residence. Confidential informants also reported that Fortson lived with his girlfriend at the 960 Snowfall residence, which they gleaned, in part, from the fact that he was often present at the 960 Snowfall residence when they went unannounced to purchase drugs. (Doc. No. 46, at 23–25, 43, 48–49, 78.)

Consistent with this information, TFO Liggett testified that, prior to proceeding to 960 Snowfall, he also had reviewed the GPS data from Fortson's ankle monitor for the two days prior to the search and learned that Fortson was at the 960 Snowfall residence and did not return at any point to his APA-approved residence. (*Id*. at 25, 43, 48–49.) Moreover, once officers arrived (unannounced) at 960 Snowfall to effectuate Fortson's arrest, they found the black Lexus in the driveway and saw Fortson through a back window in the property. Fortson eventually let the officers into the residence. (*Id*. at 7, 11; *see* Doc. No. 132-1 ¶¶ 31, 34.)

Fortson offers innocent reasons for his presence at 960 Snowfall, including that he was merely an overnight guest of his girlfriend, who resided at the property. (Doc. No. 122, at 7.) This is not a new argument, as Attorney Cafferkey also argued on behalf of his client that Fortson was temporarily staying with his girlfriend at the residence as an invited guest. (Doc. No. 22, at 4.) It is also beside the point. The question is not whether Fortson believed he was permitted as a probationer to visit his girlfriend overnight. Rather, the relevant inquiry is whether officers had reason to believe that Fortson resided at the 960 Snowfall residence.

Courts have consistently found that officers had probable cause to believe that a

probationer resided at a particular premises under circumstances similar to those presented in this case. *See, e.g., United States v. Damron*, No. 18-3129, 2018 WL 7253960, at *4 (6th Cir. Sept. 10, 2018) (officers had probable cause to believe that probationer was living at residence where girlfriend's parents advised officers probationer was living there with their daughter, he registered the address with another sheriff's office, and officers confirmed he was at the residence when he met officers at the door); *Payne*, 588 F. App'x at 433–34 (officers had probable cause to believe probationer stayed at residence where they were unable to confirm probationer still resided at approved residence, had been observed coming and going from the searched residence, and the owners were aware probationer was living at the searched residence with his girlfriend); *Rogers*, 2021 WL 825988, at *6 (tips to officers that probationer was growing marijuana and storing firearms at the residence, evidence of a kennel at the residence for probationer's dog, and the fact that officers saw probationer briefly exit the residence when they arrived all combined to establish probable cause that probationer was residing there).

In upholding such a search, the court in *Rogers* noted that if it were to "permit the search condition of Defendant's probation order to be so easily evaded despite numerous indications that Defendant was using [the searched premises] as his residence, at least part of the time, then it would permit future probationers to get around these provisions by simply staying at a different residence every few days." *Rogers*, 2021 WL 825988, at *6. Similarly here, the record clearly established that Fortson was using 960 Snowfall as a residence, even if it was not his APA-approved residence. Because the arguments regarding Fortson's belief in his status as a guest would not (and, at the hearing, did not) counsel in favor of a different result, prior counsel cannot have been ineffective for failing to raise them or present them in a way Fortson now suggests. *See*

*Goff v. Bagley*, 601 F.3d 445, 468 (6th Cir. 2010) (counsel was not ineffective for failing to raise a frivolous argument (citation omitted)); *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (determining that the failure of defense counsel to pursue futile motions and objections cannot constitute ineffective assistance of counsel). Further, the fact that such argument was not reasonably likely to produce a different outcome at the suppression hearing prevents Fortson from satisfying *Strickland's* prejudice prong. *See Strickland*, 466 U.S. at 694; *Morrow*, 977 F.2d at 229.

Fortson also argues that Attorney Cafferkey was ineffective for failing to request a hearing under *Franks v. Delaware*, 438 U.S. 154, 89 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). A defendant is entitled to attack the validity of a search warrant and the supporting affidavit at an evidentiary hearing known as a "*Franks* hearing," if he "(1) 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Green*, 572 F. App'x 438, 441 (6th Cir. 2014) (quoting *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001)). But affidavits supporting a search warrant enjoy "a presumption of validity[.]" *Franks*, 438 U.S. at 171. "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehoods or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id*. The Sixth Circuit has characterized this as a "heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). Further, even if the defendant overcomes these factual hurdles, a *Franks* hearing will only be warranted "[i]f, when the alleged false statement is put aside, the affidavit no longer provided the court with probable cause[.]" *United States v. Poulson*, 655 F.3d 492, 504–05

(6th Cir. 2011) (citation omitted).

According to Fortson, TFO Schmitt included several obvious and intentional false statements in his affidavit supporting the warrant application. For example, Fortson points to a statement from a confidential informant, identified in the affidavit as "CS-1," that she had seen Fortson at the 960 Snowfall residence "approximately 1 month" before January 23, 2019, the date of the interview. Fortson argues that TFO Schmitt "should have known at this point that CS-1 was lying because Mr. Fortson would have been in prison one month prior[,] having been in prison from July 2018 until January 4, 2019. (Doc. No. 122, at 12.) The Court disagrees, as the reasonable officer would have understood that the confidential informant was not offering a precise date. Rather, as she, herself, described it, the informant was discussing an event occurring *approximately* one month before the interview.

Similarly, Fortson highlights that CS-1 gave inconsistent accounts of the way in which the methamphetamine sold by Fortson was stored. In particular, he notes that in one interview the witness indicated that 55-gallon drums were full of freezer bags of Crystal Meth, while, in a second interview, CS-1 said the same drums were "filled approximately three quarters of the way up with a crystal like substance[.]" (Doc. No. 122, at 12 (citing Warrant Affidavit).) At best, this represents a minor inconsistency in the informant's recollection or recitation of the facts between interviews. The Sixth Circuit has held that "there must be evidence of more than mere factual inaccuracy to overcome *Franks*[.]" *Butler v. City of Detroit*, 936 F.3d 410, 420 (6th Cir. 2019) (collecting cases).[9] "Minor discrepancies in the affidavit may reflect mere inadvertence or negligence, rather

---

[9] Of course, the fact that TFO Schmitt revealed the details of both interviews also cuts against Fortson's argument that the officer was intentionally trying to mislead the magistrate.

than the reckless falsehood that is required for exclusion." *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002) (citing *United States v. Searcy*, 181 F.3d 975, 980 (8th Cir. 1999)).

Finally, Fortson argues that TFO Schmitt included a false statement from another confidential informant ("CS-2"), who claimed that Fortson reduced the price of methamphetamine in November 2018. This too, Fortson suggests, was an obvious lie because he was in prison at the time. (Doc. No. 122, at 13.) Fortson forgets, however, that officers were aware from CS-2 that Fortson continued to engage in drug trafficking in prison with the assistance of his girlfriend. (*See* Doc. No. 132-1, at 13 ¶ 20.) Because the officers knew that Fortson continued to sell drugs from prison, there is no basis to conclude that the statement was false, let alone a deliberate falsehood.

While Fortson nitpicks at the affidavit, parsing every sentence in search of deliberate lies and blatant misrepresentations of the truth, he has failed to find any. Even now, he cannot meet his heavy burden of making a substantial preliminary showing that TFO Schmitt believed that the information he placed in the affidavit was false or that he offered it with a reckless disregard for the truth. Because there would have been no basis for the Court to hold a *Franks* hearing, former counsel cannot have been ineffective for failing to request one.

Of course, Fortson's ineffectiveness arguments are largely academic, as the Court ultimately determined that the evidence yielded from the warrantless search would have inevitably been discovered in the course of the DEA's drug investigation of Fortson and 960 Snowfall. (*See* Doc. No. 31, at 11–14.) The inevitable discovery doctrine constitutes an exception to the exclusionary rule that permits the district court to "admit illegally obtained evidence if the evidence would inevitably been discovered through independent, lawful means." *United States v. Christian*, 39 F. Supp. 3d 942, 950 (N.D. Ohio 2014) (citing *United States v. Alexander*, 540 F.3d 494, 502–

03 (6th Cir. 2008)). As detailed in TFO Schmitt's affidavit, the DEA had substantial evidence derived from various investigatory techniques that Fortson was operating an on-going drug trafficking operation out of the 960 Snowfall residence. Because the Court found that the drugs and weapons evidence located at 960 Snowfall would have been discovered once the DEA agents used the information from their investigation to secure a warrant (as they ultimately did), Fortson's new suppression arguments would not have changed the result at the suppression hearing.

As set forth above, Fortson has failed to demonstrate that his former counsel was ineffective, or that any alleged ineffectiveness prejudiced him. He cannot, therefore, meet either prong of the *Strickland* standard, and his motion for a new trial would be denied for this additional reason.

### B.  Motion to Reopen the Suppression Hearing

Alternatively, Fortson seeks to reopen the suppression hearing so that he can, in part, recall former-APA Parole Officer Rankin and question him regarding recently acquired documentation. In the supplement, Fortson explains that the defense recently obtained the APA's Case Notes Report for Fortson's file and former Parole Officer Rankin's APA personnel file. (Doc. No. 129, at 1.) According to Fortson, the latter is significant because it contained records documenting disciplinary action taken against Officer Rankin for violating APA policies by purchasing chips and coffee for a parolee and buying clothing and a gaming system from another parolee. (*See* Doc. No. 129-1 (Pre-Disciplinary Meeting Hearing Officer's Report).) The case notes are relevant, Fortson contends, because they support his position that Rankin told him he could be away from his residence for several days without a violation, and because he believes they support his position that APA Supervisor Tiffany Lightfoot believed that the task force was "shady" and had used

officers in the past (including Rankin) to circumvent the law. (Doc. No. 129, at 2; *see* Doc. No. 126-1 (Case Notes).)

The government argues that, at this late juncture, any arguments relating to suppression are waived. Under Rule 12(b)(3), issues relating to the suppression of evidence must be raised pretrial before the deadline set by the district court. Fed. R. Crim. P. 12(b)(3)(C), (c). Failure to submit a motion to suppress evidence in a timely fashion under Rule 12(b)(3) "shall constitute waiver thereof, unless the court grants relief from the waiver." *United States v. Worthington*, 698 F.2d 820, 824 (6th Cir. 1983) (citation omitted). The waiver rule serves to ensure that trials proceed smoothly with clear rulings as to the admission of evidence. While the rule extends to the district court the power to entertain an untimely suppression motion, the movant must first show "good cause." Fed. R. Crim. P. 12(c)(3); *see United States v. Gulley*, 780 F. App'x 275, 282 (6th Cir. 2019) (quoting *United States v. Trujillo-Molina*, 678 F. App'x 335, 337 (6th Cir. 2017)).

Fortson explains that the APA records were only recently obtained through his counsel's request under the Freedom of Information Act. (Doc. No. 129, at 1 n.2.) Fortson also underscores that the disciplinary action taken against Rankin was ongoing at the time of the suppression hearing and was, therefore, unavailable to prior counsel at the time of the hearing. (*Id.* at 1–2.) Even if the Court were to find that these documents were not accessible to Fortson at any time prior to trial, Fortson still would not be able to demonstrate good cause for entertaining the untimely motion to reopen suppression because the newly acquired documents provide no basis for the Court to reconsider its suppression ruling.

Beginning with the disciplinary action taken against Rankin, the Court concludes there are several reasons why these documents would not have changed the Court's resolution of the

suppression motion. First, it appears that Rankin grieved the discipline and the parties ultimately entered into a settlement, wherein the APA agreed to provide Rankin with a lump sum cash payment in exchange for his resignation. (*See* Doc. No. 129-2 (Settlement Agreement), at 1.) To the extent that the discipline was in any way suggestive of dishonesty, the settlement rendered it of limited evidentiary value.

Second, Rankin's testimony was of minimal consequence to the suppression hearing. He testified that he had little to do with Fortson's arrest or the search of his residence. (*See* Doc. No. 46, at 93 (explaining that nothing was in his control once TFO Liggett arrived on the scene).) Third, he was not responsible for the decision to arrest Fortson, as that decision was made by his supervisor. (*Id*. at 42–43, 92.) Finally, the Court did not rely on Rankin's credibility in reaching its decision. In fact, the Court observed that it found Rankin less than credible, given his apparent inability on the stand to remember with clarity the events surrounding the search. (Doc. No. 31, at 3 n.3.) Consequently, "the Court found the testimony of TFO Liggett and Retired U.S. Deputy Marshall Jeff Hall—who both appeared to have better memories of the events of March 6, 2019, and who testified consistently and credibly as to those events—more reliable." (*Id*.)

But Fortson argues that only Rankin was aware of the evidence surrounding Fortson's supposed supervision violations. (*See* Doc. No. 129, at 2–3.) This is not accurate. TFO Liggett testified that he had reviewed the GPS data from Fortson's ankle monitor and knew that he had not returned to this APA-approved residence for two days prior to the search, suggesting that Fortson had changed his residence without permission—a parole violation. As detailed above, he had other information from the DEA's drug trafficking investigation that Fortson was using the 960 Snowfall premises as a residence, not to mention the fact that he found Fortson at the residence

at the time of his arrest. Additionally, the evidence of drug trafficking suggested a second parole violation—illegal activity.

There is also no valid basis for reopening the suppression hearing so that Fortson can ask Rankin about a conversation he had with Fortson, wherein Rankin allegedly advised Fortson that he could be away from his APA-approved residence for periods of time without violating supervision. Fortson was obviously aware of the conversations he had with Rankin, and there was nothing preventing prior counsel from inquiring about this conversation at the hearing. The production of Rankin's case notes does not change the analysis. While the 21 pages of single-spaced notes summarize several conversations between Rankin and Fortson, the notes make no reference to any conversation about staying at unapproved residences. The absence of any reference to such a conversation—in the face of detailed notes recounting other conversations, including conversations stressing the importance of keeping contact information up-to-date—is telling.[10]

Still, Fortson says the case notes "suggest that this was a common practice[.]" (Doc. No. 129, at 6.) Fortson overstates the evidentiary value of these documents. At best, entries in these documents demonstrate that Rankin was unable to locate Fortson on numerous occasions at his APA-approved residence. While Rankin did not immediately take action against Fortson each time this happened, on at least one occasion he sought a fugitive warrant for Fortson's arrest. (*See* Doc. No. 126-1, at 11 (5/25/2018 12:00 am entry).) Such action is entirely inconsistent with Rankin

---

[10] In one such entry, Rankin admonished Fortson for failing to update his residence information to show that he had moved to another unit in the same building. While Fortson maintained that he did not know that he was required to report a move across the hall in the same building, Rankin stressed the importance of having entirely accurate contact information for him. (Doc. No. 126-1, at 18 (11/14/2016 4:19 p.m. entry).)

having advised Fortson he could be away from his residence at will without consequences.[11]

The hearsay evidence of APA Supervisor Lightfoot, to the extent it would have even been proper to consider it, also would not have given the Court pause. While Fortson now offers it in an apparent attempt to argue that the task force used APA parole officers to side-step the law (*see* Doc. No. 129, at 5), the Court previously rejected such an argument *as a matter of law*. (Doc. No. 31, at 9 (observing that the Sixth Circuit "recently concluded that the 'stalking horse' caveat, if it survives *Knights* at all, does not apply when the probationer is subject to a valid search provision and law-enforcement officers have a reasonable suspicion that the probationer is engaging in illegal activity" (quoting *United States v. Ickes*, 922 F.3d 708, 712 (6th Cir. 2019))).)[12]

None of the documentation supporting the motion to reopen suppression warrants reversal of the Court's pretrial determination on suppression or even supports a reopening of the hearing. Because the Court has already given full consideration to the relevant issues surrounding Fortson's arrest and the search of the 960 Snowfall residence, it is not necessary to revisit these issues post-trial. *See, e.g., United States v. Booker*, No. 3:10-cr-44, 2011 WL 2200028, at *2 (E.D. Tenn. June 7, 2011) (denying the defendant's arguments for new trial pertaining to alleged errors in the Court's ruling on pretrial motions, including motions to suppress, explaining that it would not revisit rulings made prior to trial as they stand on the record).

While newly appointed counsel may have approached the pretrial suppression hearing

---

[11] The case notes also make repeated reference to the fact that Fortson was considered a "high risk" parolee, placing him on a high level of supervision. (*See, e.g.*, Doc. No. 126-1, at 5 (1/9/2019 12:00 am entry).) Given his assessed high risk status, it is even less likely Rankin advised Fortson that he could spend substantial periods of time away from his registered residence.

[12] It is also worth noting that the same person who purportedly authored the rumor that the task force was "shady"—APA Supervisor Lightfoot—was the one who approved the use of the task force to arrest Fortson for parole violations, rendering her out-of-court statement regarding the task force of even less persuasive value as it relates to the present search and arrest.

slight differently if she had been counsel of record at the time, this alone does not mean that prior counsel was ineffective or that the suppression hearing should be reopened. *See Harrington v. Richter*, 562 U.S. 86, 106, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ("There are . . . countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.") And the Court appreciates the obligation of every defense attorney, including those appointed late in criminal proceedings, to vigorously represent their client in good faith. But, given the facts of this case, "[a] change in counsel alone is not sufficient to constitute good cause to grant relief from a waiver." *Gulley*, 780 F. App'x at 283 (quoting *United States v. Reynolds*, 534 F. App'x 347, 357 (6th Cir. 2013)). Finding no good cause to revisit suppression, Fortson's alternative motion to reopen the suppression hearing is denied.

## III.    CONCLUSION

For the foregoing reasons, Fortson's motion for a new trial and to reopen the suppression hearing is denied. By separate order, the Court will reschedule this matter for a sentencing hearing.

**IT IS SO ORDERED**.


Dated: January 29, 2025

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

27